Nicholas A. PALMIGIANO, et al.

v.

Edward DiPRETE, et al.

Thomas R. ROSS, et al.

v.

Edward DiPRETE, et al.

Civ. A. Nos. 74–0172 P, 75–0032 P.

United States District Court, D. Rhode Island.

May 18, 1990.

Alvin Bronstein, Nat. Prison Project of the ACLU Washington, D.C., for plaintiffs.

George Cappello, R.I. Dept. of Corrections, Cranston, R.I., David Dugan, R.I. Atty. Gen.'s Dept., George Vetter, Peter Palumbo, Providence, R.I., for defendants.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

In my Opinion and Order of April 6, 1989, I set forth the travel of this case as it developed from my order of October 21, 1988 when Governor DiPrete and John J. Moran, Director of the Rhode Island Department of Corrections "were found to be in contempt of court for having failed to comply with certain provisions contained in standing orders of this Court regarding conditions of confinement at the state's Adult Correctional Institutions (hereinafter 'ACI'): ... the prohibition against housing pre-trial detainees in dormitories, the limitation on double-celling any pre-trial detainee for more than thirty days, and the population cap of 250 persons at the Intake Service Center (hereinafter 'ISC'), this last having been entered with the consent of the parties. Defendants were ordered to file with the Court by November 21, 1988 a specific and detailed plan, to be approved by the Court, which would ensure compliance with the enumerated provisions. The Court further ordered that the defendants might purge themselves of contempt by implementing, by February 20, 1989, their plan to comply with the standing orders. Finally, the Court ordered that, if defendants failed to file a plan with the Court by November 21, 1988 or if they failed to bring the ISC into compliance with the court orders by February 20, 1989, fines would accrue at the rate of $50 per day for each person held in the ISC in excess of the 250 population limit." [1]

Because the factual findings and legal conclusions set forth in my Opinion and Order of April 6, 1989 are relevant and pertinent to the instant matter, I do not feel it is necessary to either reiterate or summarize the same. I refer the reader to 710 F.Supp. 875 (D.R.I.1989) and incorporate herein its factual and legal pronouncements.

On November 21, 1989, the plaintiffs filed a "Motion for a Hearing on the State of Compliance at the Intake Service Center." That motion focuses on a specific provision of the April 6 order. Because of the brevity of the memorandum in support of the motion, I quote the same in its entirety.

In its April 6, 1989 Opinion and Order, the Court stated, *inter alia,* that:

IT IS FURTHER ORDERED that the accrual of new fines will be suspended for six months from the effective date of this Order, *at which time a compliance hearing will be held.* By the date of the compliance hearing, the court expects that defendants will have implemented the initiatives which they set forth in the December Plan and the February Report to bring the ISC into compliance with the Court's standing orders. Defendants must not rely only on the Emergency Overcrowding Relief Fund or Project Bail;

1. At midnight on May 9, 1990, there were 557 persons housed at the ISC and 223 in the Pinel Building.

they must move forward with alacrity on all fronts. Defendants are hereby put on notice that the Court will consider harsher sanctions if defendants are again found to be in contempt of court.

*Palmigiano v. DiPrete*, 710 F.Supp. 875, 889 (D.R.I.1989), *aff'd.* No. 89–1440 [887 F.2d 258] (1st Cir. 8/17/89) (emphasis added).

The plaintiffs are informed and believe that defendants continue to be wholly out of compliance with the standing orders of the Court with respect to the Intake Service Center. Plaintiffs will urge the Court to find defendants in continuing contempt of court and will provide the Court with a list of proposed sanctions, together with authority in support of each sanction, prior to the hearing.

Wherefore, plaintiffs, by undersigned counsel, request that the Court schedule a hearing on the current state of compliance at the Intake Service Center of the Adult Correctional Institutions.

On December 5, 1989, I held a hearing on this motion; post-hearing briefs were received in December. On January 8, 1990, the defendants filed a "Motion to Modify Orders" and a "Motion to Modify the April 6, 1989 Order"

... to exclude from eligibility for Emergency Overcrowding Relief Fund bail those detainees held on charges of rape (first degree sexual assault), murder in the first degree, and first degree child molestation, as well as any defendant arrested for a crime of violence against the person while bailed under the Emergency Overcrowding Relief Fund.

Removing the prohibition against "dormitory" housing of pre-trial detainees (1977 Order decretal ¶ 2(b));

Permitting the dormitory housing in two new 40–bed units of 80 protective-custody pre-trial detainees;

Temporarily (until the completion of the ISC permanent annex construction) allowing the housing of sentenced and pretrial detainees together in the discretion of the Director of the Department of Corrections;

Temporarily (until the completion of the ISC permanent annex construction) permitting the double-celling of ISC inmates in excess of 45 days in the discretion of the Director of the Department of Corrections; and

Establishing the population cap for the Intake Service Center at 416 (four hundred sixteen) inmates.

On February 5, 1990, I issued an order appointing Vincent M. Nathan as an expert; I incorporate said order as part of this Memorandum and Order and because of its conciseness, I attach a copy hereto as Appendix A. Finally, on March 14, 1990, I issued an order encompassing the Pinel Building (annex to ISC) as part of this litigation.

On May 10, 11 and 14, 1990, I heard further evidence on the litigants' motions, identified *supra*. At the hearing, the plaintiffs presented three experts; their testimony is summarized as follows:

Patrick McManus[2] toured the ISC in October and December, 1985, October, 1989, and May, 1990. He provided compelling testimony on the changes in the institution over the last five years. In October, 1985, the inmate population stood at 345; in May, 1990, the population in the ISC was 553.

Because of the increase and the resultant overcrowding, Mr. McManus testified that conditions in the ISC now were "much, much worse, much, much worse" than they were in 1985. Virtually no program or education space remains in the ISC; space formerly used for these activities is now used to house prisoners. Day rooms now have bunk beds; hallways, with no immediate access to toilets or showers, have been

---

**2.** Mr. McManus qualified in 1985 as an expert in this litigation. He has been the Deputy Commissioner of Corrections for Minnesota and the Director of Corrections for Kansas. Since 1985, he has served as a special master for a federal district court in litigation over the Tennessee prisons and for the West Virginia Supreme Court in litigation over the state prison at Moundsville. Additionally, he has been a member of a compliance panel for the district court in Hawaii.

converted to housing. Even the law library houses prisoners, making it necessary for prison officials to close the library for much of the time.

In Mr. McManus's opinion, the overcrowding in the ISC and Annex has taxed the support services and reduced recreation space for the institution, and, most importantly, created an atmosphere in which violence plays an increasingly common role. Drawing on Mr. Nathan's report, Mr. McManus considered the presence of 90 prisoners in protective custody to be an indication that the inmates viewed the ISC and Annex as "a dangerous place to live." Moreover, Mr. Manus found the 222 disciplinary write-ups for assaultive behavior and the 72 inmate assaults on correctional officers between January, 1989 and February, 1990 "extremely high" and a direct result of the overcrowded conditions.

Mr. McManus, in response to my inquiry, felt conditions in the ISC and Annex were so serious that I must take "immediate and uncompromising action" to alleviate the overcrowding; I cannot, in his opinion, wait for the state to finish a new addition to the ISC. Mr. McManus agreed with Mr. Nathan's recommendations and found the conditions in the ISC and Annex to be neither constitutional nor in compliance with my standing orders.

Theodore Gordon [3] testified after Mr. McManus and covered the deficiencies in the environmental health and safety at the ISC. Overcrowding at the ISC, in Mr. Gordon's opinion, has overwhelmed the institution's maintenance and support services and, therefore, it represents "an immediate and overt threat to the inmate population." He described living conditions that, because of the overcrowding, were cramped, noisy, and stifling. The ISC did not, in Mr. Gordon's opinion, conform to this Court's standing orders or the environmental health and safety standards promulgated by the American Public Health Association

("APHA"), standards this Court has followed in its previous opinions.

Specifically, Mr. Gordon felt that the overcrowding has compromised the food service, maintenance, and fire safety at the ISC and Annex. He inspected the kitchens and found that the ovens and other equipment could not handle the increased number of meals the ISC had to provide. The ovens were greasy and had not been cleaned; the refrigerators were dirty, and, because they had to hold more food than they had capacity for, they could not maintain adequate food temperatures. Moreover, he found mouse droppings and evidence of roaches. Mr. Gordon concluded that the overcrowding, and the corresponding burden on the food service operation, resulted in a very serious potential for food-borne disease at the ISC.

Similarly, he found shortcomings in the fire safety at the institution. First, many housing areas either do not have adequate paths for evacuation in the event of a fire or, because of the double bunks, have obstructed paths for evacuation. Second, the fire alarms and smoke detectors have not been maintained. Finally, Mr. Gordon felt that the prison officials' inability to maintain an adequate ventilation system exacerbated the unhealthy environment created by overcrowding.

When I asked Mr. Gordon whether I had to take immediate action or could wait for the completion of the new ISC addition, he outlined several steps the prison officials could take to remedy, at least temporarily, some of the environmental health and safety deficiencies at the ISC. First, the officials should institute a 24-hour fire watch and inspect and repair the ISC's fire and smoke alarm system. Second, the institution should increase its maintenance staff in order to clean the ventilation system and food service area. Third, the officials should increase the number of food service staff and more closely monitor the temper-

---

**3.** Mr. Gordon testified as an expert in this Court in 1977 and 1985. He is a senior policy analyst for the District of Columbia's Department of Consumer and Regulatory Affairs. That Department has direct responsibility for monitoring the compliance of the District's correctional fa-

cilities with a federal court's order. Mr. Gordon has inspected, in his estimate, three quarters of the state prisons and jails in this country and has been involved in developing environmental health and safety standards for correctional institutions.

atures of the prepared food. Finally, the prison officials should ensure that the bunks in the ISC are at least three feet apart and placed head to foot to decrease the risk of spreading infectious disease.

Mr. Gordon emphasized, however, that, unless the inmate population is brought down to manageable levels, any measures to improve the food service conditions would soon be overwhelmed by the burden of providing food for too many prisoners. He thought that the institution might be able to get by for another four months but "would not recommend that the Court take that risk."

Dr. Lambert King[4] was the plaintiffs' final expert witness. His testimony covered the inadequacies of the medical services at the ISC caused by the overcrowding. He found that the medical and dental examination of prisoners when they arrive at the ISC failed to meet APHA standards, that screening for tuberculosis was deficient, and that the medical records were improperly documented. Additionally, he felt that the medical system was drastically undersupported. A shortage of nurses, medical doctors, and physician assistants and a lack of consistent medical leadership has led, in Dr. King's opinion, to a situation in which the staff at the ISC cannot meet the legitimate medical needs of the inmates; the organization and provision of medical services at the ISC are random and chaotic.

Dr. King, in response to my questions, stated that the medical shortcomings at the ISC represented a serious and present danger to the prisoners that required my immediate intervention. I specifically asked, "Do you believe that the situation is so critical as to mandate an immediate and uncompromising intervention by this Court?" His answer was, "Yes, I do, Your Honor." He felt that I should not wait before taking action to alleviate the strain on institution caused by overcrowding. The potential for the spread of contagious disease, particularly tuberculosis, was, in Dr. King's opinion, particularly grave. Most tellingly, for this Court, Dr. King found that, in comparison with fifteen other prison systems he has inspected, the ISC is at the bottom in terms of organization, leadership, and resources.

The court appointed expert Vincent Nathan also testified. In essence, he reiterated much of what he already submitted in his reports, which are filed as part of the record in this case. The need to expedite this Memorandum and Order, in the face of pressing trials and other court commitments, causes me not to labor a reiterative narrative of his report; instead, the expert's Executive Summary is attached as Appendix B. Suffice it to say, I adopt his overwhelming factual findings.

Excepting for Mr. Moran's testimony, I have before me an uncontradicted record of sordid and explosively dangerous conditions existing at the ISC caused by overcrowding—in many respects deja vu of the Maximum Security Section as it existed in 1977. *See* 443 F.Supp. 956 (D.R.I.1977). The record will show that I probed in vain to get some support for deferring action to November, 1990 when the new ISC permanent annex is scheduled for completion. Repeatedly, I asked each witness if I could wait and, in substance, coupled such inquiry with the further question, "Do you believe that the situation is so critical as to mandate an immediate and uncompromising intervention by this Court?" The answer was always the same—I had to act now. In fact, I pressed Mr. McManus, who persisted in saying I should act immediately; a two month, three month or four month wait could not be tolerated.

Now, it is true Mr. Moran is of a contra mind, but it must be remembered he is on the firing line; with all due respect—and

---

4. Dr. King is the Medical Director and Vice President for Professional Affairs at the Saint Vincent Hospital and Medical Center of New York City. In addition to his responsibilities for the direction of the medical services within the hospital, he is responsible for the provision of ambulatory medical, dental and mental health services at the Manhattan Detention Center in Manhattan as well as two maritime facilities housing additional inmates. He formerly served as the Director of the Montefiore–Rikers Island Health Services in New York City, and as a special master at the Menard Correctional Center in Southern Illinois.

this Court does respect Mr. Moran, appreciating the Herculean task resting on his shoulders as created by the uncontrollable proliferation of inmates—I cannot accept his self-serving assessment. It is also true Mr. Gordon offered some weak support for waiting, if certain conditions were immediately and unequivocally met. However, his strong testimony describing the intolerable conditions he encountered, negated any serious thought of postponing my intervention.

The final, quintessential blow to defendants' request that this Court stay its hand until November was accomplished by defendants' own witness—Major John D. Case. He testified that he found the conditions unconstitutional "as far as what [he] understand[s] to be at the present time," albeit he did not find "them to be unconstitutional and cruel and unusual ... when [he] was there on the 5th of December when the total count between the two institutions [he] believe[d] was—the count, the count at the jail was 526"; he hoped it would be reduced to 416.

I then asked, "Do you believe the conditions are so critical as to required immediate action?" Answer: "Yes, I do." This was followed with an inquiry as to whether or not the Court could "stay its hand" if certain conditions were effectuated immediately, i.e., such as correcting the ventilating system, repositioning the present health hazardous sleeping arrangements, repairing the unsatisfactory operation of the fire alarm system, instituting a 24–hour fire watch, correcting present unhealthy sanitation conditions, increasing maintenance staff, and completing the new building by November. He answered this in the affirmative but engrafted a further condition—the "release [of] sentenced inmates three months before the expiration of their

sentence." I then put the following question to the witness: "Now Mr. Nathan you know, has recommended that there be accelerated parole consideration in this sense, that the—give them ninety days good time and that would do, if I understand correctly, would do two things. One, it would accelerate the mandatory release time of certain inmates and, secondly, it would expedite the parole hearing time on other inmates. Would you recommend that be put into effect?" Answer: "Yes, indeed, your Honor."

The record portrays an emergency situation screaming for instant action. The Court's own searching questions for an alternative approach proved to be a futile quest.

I find the defendants are in continuing contempt of this Court. Accordingly, it is hereby

1. ORDERED that defendant shall maintain at all times at least Two Hundred Thousand Dollars ($200,000.00) or, as requested by the state, its equivalent as may be acceptable by the state judiciary, to finance the Emergency Overcrowding Relief Fund to provide bail for all indigent detainees with bail set at Ten Thousand Dollars ($10,000.00) cash or less. It is further

2. ORDERED that all sentenced prisoners in the ACI shall immediately be awarded 90 days of expedited good time, which shall be applied against the maximum sentence of each affected prisoner and shall, contrary to the terms of R.I.Gen.Laws sec. 42–56–24, be deemed to advance each affected prisoner's eligibility for consideration for parole. Moreover, all sentenced prisoners, regardless of the length of their terms of incarceration, shall receive the expedited good time required by this order.[5] It is further

---

5. Because the plaintiffs' motion and subsequent hearings were directed only at the overcrowding in the ISC and the Pinel Annex, which house only male prisoners, the order shall apply only to male prisoners. Although the Court cannot so order, it is hoped that defendants will voluntarily apply the terms of this order, to the extent possible, to female prisoners.

The Court recognizes that the effect of this portion of its order may be that some prisoners

sentenced to 90 or fewer days of incarceration will be released without serving any time in prison. First, the extreme gravity of the situation at the ISC and the Pinel Annex justifies this relief. Second, granting an award of expedited good time to prisoners with longer sentences, who presumably have committed more serious offenses, while excluding from this order prisoners whose short sentence suggest that they

3. ORDERED that expedited awards of 90 days of good time shall be made every 30 days in accordance with the immediately preceding paragraph of this order until all sentenced prisoners have been removed from the ISC and the Pinel Annex. It is further

4. ORDERED that no later than 30 days following the entry of this order, no more than 450 prisoners may be housed at the ISC and no more than 184 prisoners may be housed at the Pinel Annex. At the expiration of this 30 day period, the parties shall meet with the Court to evaluate the progress made by the defendants. At that time, this Court will issue orders establishing goals for further reductions and the means to achieve these goals. It is further

5. ORDERED that defendants shall take all steps, in addition to those specified above, to accomplish the maximum capacities as heretofore established by this Court. It is further

6. ORDERED that on the 31st day following the entry of this order, defendants shall file a report of the population of the ISC and the Annex. The report shall reflect the daily population of each facility between the date of this order and the date of the report. In the event defendants fail to achieve and maintain the required maximum capacities required by this order, the Court will enter a subsequent decree enforcing the terms of this order. That decree will include such other relief as the Court finds necessary to ensure compliance with the instant order, and may include imposition of daily fines of $50.00 per prisoner per day in excess of the relevant maximum capacity. It is further

7. ORDERED that within 60 days following the entry of this order, no prisoner shall be assigned to a double occupancy cell or any dormitory in the ISC, or to any multiple occupancy room in the Pinel Annex, unless that prisoner has been properly classified and is housed only with prisoners of the same classification. Prisoners classified as high security, maximum security, and protective custody shall be housed in single occupancy cells, and one or more

present the least danger to the community,

modules in the ISC shall be designated for exclusive use by prisoners requiring protective custody. Sentenced prisoners shall be classified within 30 days of sentencing and, until classification, shall be assigned to single occupancy cells in modules reserved for unclassified sentenced inmates. Modules and dormitories shall be restricted by class of prisoners (sentenced or pretrial) and, to the greatest extent feasible, by classification. It is further

8. ORDERED that within 14 days following the entry of this order, defendant shall cause intake medical screening of all prisoners assigned to the ISC and the Pinel Annex to be completed within seven calendar days of the prisoner's incarceration. It is further

9. ORDERED that within 14 days of this order defendants shall cause the results of tuberculin skin tests to be examined and evaluated by appropriate medical personnel no earlier than 48 and no later than 72 hours following administration of the test. It is further

10. ORDERED that within 14 days of this order defendants shall deploy security staff members whose primary duties shall be the monitoring and detection of fires and fire hazards, including but not limited to the presence of excessive quantities of flammable materials, obstructions to fire exits, and inoperative fire alarm and fire suppression equipment. Each such staff member shall be responsible for no more than two housing units in the ISC or one wing in the Pinel Annex. Defendants also shall notify the local fire marshal that the maximum occupancy capacities of the ISC and the Pinel Annex are being exceeded. It is further

11. ORDERED that commencing immediately all fire detection and suppression equipment in the ISC and the Annex shall be maintained in proper working order and shall be inspected regularly and frequently by qualified institutional personnel and representatives of the State Fire Marshal's office. It is further

would be anomalous.

12. ORDERED that within seven days of the entry of this order defendants shall rearrange the beds located in dayrooms and dormitories so that beds are separated by unobstructed corridors of at least 36 inches in width. No such corridor shall terminate at either end at a solid wall. Additionally, to assist in the prevention of transmission of disease, beds in dayrooms and dormitories shall be rearranged to ensure that prisoners sleep head-to-foot. It is further

13. ORDERED that within 30 days of the entry of this order defendants shall balance and repair the ventilation system at the ISC to ensure that the system operates properly and effectively. It is further

14. ORDERED that within 14 days of the entry of this order defendants shall take all steps necessary to ensure that proper sanitary conditions are maintained in the kitchen of the ISC and the food service areas of the Pinel Annex and that all necessary precautions are taken to ensure that food is prepared and served in a manner that does not endanger the health of prisoners.

Orders numbered 1, 2 and 3 shall not apply to inmates charged with murder in the first degree, rape, first degree sexual assault, first degree child molestation, and any prisoner arrested for a crime of violence against the person while bailed under the foregoing program, *supra.*

The court-appointed Master, J. Michael Keating, Jr., shall monitor the defendants' compliance with this Order.

### APPENDIX A

### ORDER

### Feb. 5, 1990.

In this Court's Order of October 21, 1988,[1] defendants, Governor Edward Di-Prete and John J. Moran, Director of the Rhode Island Department of Corrections, were found to be in contempt of court for having failed to comply with certain provisions contained in standing orders of this Court regarding the conditions of confinement at the state's Adult Correctional Institutions (hereinafter "ACI"). These orders included the prohibition against housing pre-trial detainees in dormitories, the limitation on double-celling any pre-trial detainee for more than thirty days, and the population cap of 250 persons at the Intake Service Center[2] (hereinafter "ISC"), this last having been entered with the consent of the parties. Defendants were ordered to file with the Court by November 21, 1988 a specific and detailed plan, to be approved by the Court, which would ensure compliance with the enumerated provisions. The Court further ordered that the defendants might purge themselves of contempt by implementing, by February 20, 1989, their plan to comply with the standing orders. Finally, the Court ordered that, if defendants failed to file a plan with the Court by November 21, 1988 or if they failed to bring the ISC into compliance with the court orders by February 20, 1989, fines would accrue at the rate of $50 per day for each person held in the ISC in excess of the 250 population limit. Without detailing the interim actions, the bottom line is that the state failed to comply and sanctions were imposed by this Court's Order of April 6, 1989, which Order was affirmed by the Court of Appeals.

On December 5, 1989 the Court held a compliance hearing as called for by its Order of April 6. Counsel have submitted their briefs, and I now must decide whether or not the ISC of the ACI is in compli-

---

1. The Court's Opinion and Order is reported as *Palmigiano v. DiPrete,* 700 F.Supp. 1180 (D.R.I. 1988). Familiarity with this opinion is assumed.

2. The ISC was designed to house 168 persons—pre-trial detainees and newly-convicted offenders, the latter referred to as "admission and orientation" inmates (hereinafter "A & O inmates"). As long ago as 1985, corrections officials made plans to transfer these A & O inmates as a way of dealing with overcrowding at the ISC. Because of crowding in the ACI's facilities for sentenced inmates, however, the ISC has continued to house A & O inmates. Thus the severe overcrowding at the ISC has two components—growing populations of both pre-trial detainees and A & O inmates." *See* Opinion and Order, April 6, 1989, pp. 1–2.

ance with the Court's standing orders as they relate to:

a. the population cap at that facility at 250,

b. the prohibition against housing detainees in a dormitory housing,

c. the injunction against double-celling detainees for more than thirty days

d. the prohibition against intermingling sentenced inmates and detainees in the same housing area of the ISC.

In the past, specifically since August 1977, when I have had to make such decisions in this difficult, complex and frustrating litigation, I have had the invaluable expert help of court-appointed masters; for the greatest portion of the time I have had the services of J. Michael Keating. He has been the fact-finder, the evaluator, the generator of show cause orders—in short, the eyes and ears of the Court. Within the intimate and confidential clique of Mr. Keating and my brilliant young law clerks I have been able to issue orders and forge opinions which received the approbation of the First Circuit Court of Appeals. Once more this process looms before the Court; if remedial orders are mandated, they must be supported by findings of fact and evolving legal conclusions that are premised on an exhaustive record, including the recommendations and opinion of impeccable experts. If such orders are needed, bald realism presages that dramatic orders, unlike the benign ones of the past (this Court has, indeed, been benign and has acted with Job-like patience when compared with the actions taken by many other courts throughout the country), may issue. Prompted by these concerns and the desire to give counsel the benefit of a different approach that a fresh mind might take, I conferred with all the attorneys, namely Alvin Bronstein, George Vetter, George Cappello and David Dugan. Without impugning, in the least, the assistance I have received in the past, it was agreed that this Court should appoint an expert who has not been associated with this interminable litigation and who may be able to view it from a fresh perspective, if such new perspective does exist. This expert is to examine the conditions at the ISC, to submit a report and recommendation to all the interested parties, and to be cross-examined by counsel who may, if they so desire, then present testimony of their own. All parties have agreed on the duties to be performed by the expert as hereinafter set forth.[3]

Accordingly, pursuant to Fed.R.Evid. 706 the Court hereby appoints Vincent M. Nathan as an expert in this litigation as it pertains to the ISC. He graduated from the University of Oklahoma College of Law in 1959; was a professor of Law and has served as a member of the faculty of the College of Law of the University of Toledo for sixteen years; authored "The Use of Masters in Institutional Reform Litigation," 10 Tol.L.Rev. 419 (1979), republished and distributed by the Federal Judicial Center; and acted as a consultant for the National Institute of Corrections. He is recognized as one of the country's foremost experts in the field of corrections. Professor Nathan has served as a special master or special monitor in *Taylor v. Perini* (Marion Correctional Institution in Marion, Ohio); *Jones v. Wittenberg* (Lucas County Jail in Toledo, Ohio); *Guthrie v. Evans* (Georgia State Prison, Reidsville, Georgia); *Ruiz v. Estelle* (entire Texas prison system); *Duran v. Anaya* (medium and maximum security prisons in the State of New Mexico) and *Feliciano v. Barcelo* (Puerto Rico's adult penal institution).

Mr. Nathan is hereby charged with the duty of conducting an investigation, inspection and study of the Intake Service Center,[4] with authority to employ an assistant

---

**3.** A report entitled "Management Study of Rhode Island Department of Corrections" prepared by the Criminal Justice Institute, Inc. and Carter Goble Associates, Inc., dated December 20, 1989, has been submitted to the Governor of this State. At a conference with all parties, the question as to whether or not said study could be used and thus eliminate the need for an expert, was discussed. It is my opinion, and counsel all agree, that the study will not serve the aims of the Court and the purposes for which the expert is to be appointed.

**4.** The ISC and the Pinel Building are to be considered as a unit as both serve the purposes for which the ISC was constructed.

as may be necessary, and rendering to the Court and all parties named herein his expert advice and opinion on each of the following questions:

1. In the original 1977 Order this Court prohibited "dormitory housing" of pre-trial detainees. In the setting of today's critical overcrowding it would appear that, at least temporarily, this prohibition should be removed. Do you so advise? If not, why not?

2. Conceding that sentenced and pre-trial detainees must not be housed together, is there an immediately acceptable way, in view of the crises that presently exists (*i.e.*, unavailable facilities to ease the present excessive overcrowding), to temporarily permit such intermingling so as to do minimal violence to such prohibition? If there is no such acceptable way, what advice do you offer this Court?

3. The defendants ask this Court to permit double celling of the inmates in the ISC in excess of 45 days at the discretion of the Director of the Department of Corrections. In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) the United States Supreme Court held that there is no one man "one cell principle lurking the Due Process Clause of the Fifth Amendment"; it stated "[w]e simply do not believe that requiring a detainee to share toilet facilities and this rather admittedly small sleeping place with another person for generally a maximum period of 60 days violates the Constitution". Realizing the applicability of this teaching by the United States Supreme Court may be dependent on the daily period of confinement imposed on the inmates as well as other conditions, is there any compelling reason why I should not grant the defendants' motion?

4. If I should conclude that dormitory housing, intermingling of pre-trial detainees, and double-bunking should be temporarily permitted, why can I not

a) set the time limit for achieving compliance with the Court's orders to November 1990 (the anticipated date for completion of new facilities)?

b) reset the population cap at the ISC at 450–475 but only to November 1990?

5. In the April 6 Order I ordered that $164,500 of accumulated fines be paid to the Department of Corrections to finance an Emergency Overcrowding Relief Fund for the purpose of providing bail for indigent pre-trial detainees being held for want of $5,000 cash bail or less. And I further stated that when "Project Bail" (being then prepared by the Governor) was implemented, the Emergency Overcrowding Relief Fund would be discontinued and any monies left in the Fund would be transferred to Project Bail. The plans for Project Bail were completed, but I suspended the aforesaid transfer of funds because the legislature had superimposed on the conditions set by the judges of the state courts for the release of detainees additional conditions which ignored the state courts' responsibility in setting the bail. These conditions stalled the emergency release of prisoners determined eligible for bail but who were indigent at the time bail was set. Whereupon, the state immediately suspended Project Bail, contending it would have no one to bail. The contempt fines have almost been exhausted in releasing 331 detainees; as a consequence of this and the state's actions, detainees who could have been considered for release under Project Bail or the Emergency Overcrowding Relief Fund have no such remedy available to them. Because of the state's unfortunate discontinuance of Project Bail, do you recommend the imposition of another substantial fine by this Court, to be used as an Overcrowding Relief Fund? If so, what amount do you advise and to what extent will the utilization of such fine help relieve the present congestion?

If question 4 is answered affirmatively, it may be argued that no other action is necessary at this time. However, in answering the foregoing questions the expert will include in his study the consideration that the overcrowding is an ongoing problem and all answers and advice must be premised upon population projections to November 1990.

6. Does a study of the ISC's population show that if the facility was used only for detainees it would be in compliance with the Court's present orders? Assuming the answer is in the affirmative, should the present sentenced prisoners be ordered removed so as not to impose the resultant hardship, caused by their presence, on unconvicted individuals who are presumed innocent? If so, what advice do you give as to how this can be accomplished? (Note testimony of John Moran at the December 5 hearing in this regard.)

7. In answering the foregoing questions, the expert must bear in mind that the Court has in vain repeatedly urged the state to consider and implement a bail project, home confinement, an accelerated release program, and half-way houses. I fear it will serve no useful purpose to revisit that same ground. If the expert finds no satisfactory temporary relief in his answers to the foregoing questions, must the Court resort to remedies within its power such as but not limited to:

1. Order accelerated release of as many inmates as may be necessary to correct the problems at the ISC. If so what program does the expert offer?
2. Order that no further detainees be accepted at the ISC until there is compliance with the population cap?
3. Continue the Emergency Relief Fund?

*See Fambro v. Fulton County,* 713 F.Supp. 1426, 1432–33 (N.D.Ga.1989); *Duran v. Elrod,* 713 F.2d 292 (7th Cir 1983); *Twelve John Does v. District of Columbia,* 855 F.2d 874 (D.C.Cir.1988).

I realize that this study will take time. I urge that every effort be made to expedite answers so that a hearing may be held and a court order ensue. I repeat what I have stated before. Of greatest concern to this Court is the likelihood of violent loss of life or serious physical injury for detainees and prison personnel resulting from overcrowding beyond the limit set for this particular facility.

All parties have agreed to the appointment of Vincent Nathan, who has consented to act as the court-appointed expert. Prior to the filing of this Order, a copy was submitted to all parties for any deletions, additions, modifications or corrections they wished to make. This order represents the concerted participation of all concerned, including their concurrence that compensation for the expert shall be borne equally by the plaintiff and defendants.*

SO ORDERED; a copy will be filed with the Clerk of Court.

## APPENDIX B

### EXECUTIVE SUMMARY OF REPORT OF THE COURT APPOINTED EXPERT

Upon receipt of the final version of the *Report of the Court Appointed Expert,* the Court requested that the expert prepare a summary of his conclusions and recommendations based on the detailed findings contained in that report. In addition to summarizing those findings and recommendations, this document also will underscore the relationship the expert has found to exist between crowding and the findings and recommendations made by the expert in his earlier report.[1] This summary assumes familiarity with the specific findings and recommendations contained in the more comprehensive report and is not intended to modify any of those findings or recommendations.

After describing the scope of the expert's charge and the methodology used to prepare the comprehensive report, the expert described the physical configuration of the ISC and the Annex. Based on that

---

* This is not to mean that the Court is unmindful of 42 U.S.C. § 1988.

1. Crowding is the central issue pending before the Court at this time. As the Court indicated in its unpublished order of July 28, 1987, however, ... the Court's continuing intervention in the ACI must be keyed not to numbers but to the conditions that in their totality violate the constitutional rights of prisoners ... This focus on conditions, however, should not obscure the Court's experience in the long history of this case, which illustrates clearly that excessive numbers lead almost ineluctably to the rapid deterioration of conditions. *See also, Palmigiano v. DiPrete,* 700 F.Supp. 1180, 1192 at note 13.

description, he then addressed the population density in the two facilities. The sections on the physical configuration of the facilities and population density, in combination, establish the severe extent of overcrowding throughout the ISC and the Annex. All but a handful of cells in the ISC are double-celled, and prisoners are assigned to all dayrooms except in Module C, the disciplinary module. In addition, converted office space, hallways, former programmatic space, and the law library are used to house prisoners. In some of these makeshift housing units, no sanitary facilities are present, and inmates must make use of bathrooms and showers in adjoining modules. Both outdoor exercise and indoor recreation are severely affected by the number of prisoners required to use the limited facilities that are available.

Crowding is particularly acute at the Annex, where living space for prisoners ranges from 13 square feet to 60 square feet per prisoner, including the space consumed by beds. When bedspace is subtracted, prisoners in one room at the Annex have access to only 2.8 square feet per prisoner. In summary, inmates have been assigned to virtually every nook and cranny in these facilities.

One result of overpopulation is that an inadequate number of hygiene facilities is available for use by prisoners. The worst example of this effect of crowding is reflected in Module D, where the ratio of toilets to prisoners is 1:53, the ratio of lavatories is 1:26.5, the ratio of showerheads is 1:26.5, and the ratio of urinals is 1:53. Although less dramatic elsewhere, the strain on hygiene facilities is apparent throughout the ISC and the Annex.

On February 26, 1990, the ISC and the Annex held 797 prisoners. Of this number, 563 were assigned to the ISC and 234 were assigned to the Annex. At these population levels, the degree of crowding ob-

served by the expert was shocking. To make matters worse, the National Council on Crime and Delinquency projects a significant increase in the pretrial and sentenced populations of the ACI between now and October or November of 1990, when the permanent addition to the ISC is scheduled to open. Moreover, the Department's own projections anticipate an increase in pretrial prisoners by October 1990 of twice that predicted by the NCCD, and the Department's projection of its sentenced population is for only eight fewer prisoners than are projected by the NCCD. Thus, although the defendants anticipate increases in bedspace in October and November of 1990, there is a consensus that population pressures will increase dramatically between now and the time new construction becomes available.[2] Given the effects of the existing levels of population in the ISC and the Annex, which will be summarized below, it is the expert's opinion that the degree of overcrowding that will develop between now and November 1990 will be entirely unmanageable and that immediate and dramatic relief is urgently needed at this time.

Even at the current population level, security staffing is inadequate, and heavy reliance is placed on use of overtime. Surveillance of modules and makeshift housing units in the ISC is dangerously deficient, and surveillance of housing units in the Annex is almost nonexistent. Moreover, the effects of fatigue and burnout experienced when correctional officers work as many as five consecutive shifts further compromise the safety and security of inmates and staff. Until the population of the two facilities is reduced to tolerable limits, neither the ISC nor the Annex, in the opinion of the expert, can be regarded as providing a minimally adequate degree of safety and security.

The level of non-security staff reflects the dearth of programmatic activities and

---

**2.** Although defendants project an additional 1,246 "intake" beds by October/November, these projections are based on the unrealistic assumptions of 100% double celling of the permanent addition to the ISC, virtually complete double celling of the ISC (excepting only the disciplinary module), and the assignment of 150 prisoners to the Pinel Annex. In addition, defendants project an additional 340 new beds for medium security male inmates in October/November.

services available to prisoners. Apart from medical and mental health staff, only 17 part-time or full-time non-security staff are employed in the ISC and the Annex. Medical staffing provides only 15 hours of on-site physician coverage, and more registered nurses are desperately needed. At the present time, nursing staff work huge numbers of overtime hours requiring nurses to work as many as seven or eight consecutive shifts.[3] Licensed practical nurses regularly practice beyond the scope of their licensure.

The employment of more security and non-security staff, however, will not suffice to address the problems of inadequate programs and services throughout the ISC and the Annex. Even if more staff were employed, there is no physical space in which they can work. There simply are too many prisoners to permit provision of minimally adequate programs and services to prisoners, and staff presently attempting to accomplish the impossible exhibit the effects of extraordinary strain and frustration.

The extent of crowding throughout the ISC and the Annex is rendered even more dangerous by the virtually complete lack of classification of pretrial prisoners and lengthy delays in classifying sentenced inmates. Although efforts are made to identify low risk prisoners for assignment to the Annex, classification, even to the limited extent it occurs, has no bearing on a prisoner's assignment to a particular housing unit, cell, or bed at the ISC or the Annex. The exception to this state of affairs, the assignment of prisoners requiring protective custody, is equally problematic because these prisoners are housed in two open dormitories with limited surveillance. Although classification cannot be expected to make the current, not to mention the projected, population levels of the ISC and Annex acceptable, the virtually random mixing of sentenced and pretrial prisoners, without knowledge of proclivity for sexual assault or vulnerability to sexual imposition and without regard for the potential for escape or violence, heightens the risk of an already critical level of harm. The same is true of mixing of sentenced prisoners of all classifications without regard to these factors. The absence of a rational and timely classification system of pretrial and sentenced prisoners precludes the safe use of double occupancy cells or dormitories for any prisoners in the ISC or the Annex.[4]

Crowding and the ramifications of crowding that already have been discussed combine to increase the incidence of serious and dangerous disciplinary infractions, to increase the use of force to control prisoners, and to deprive prisoners of any significant degree of meaningful programming at the ISC and the Annex. The level of violent disciplinary offenses, including assaults against inmates and assaults against staff, is unacceptably high. Moreover, crowding prevents the swift imposition of disciplinary segregation as punishment for serious misconduct, because the physical facilities of the ISC cannot provide the number of disciplinary isolation cells that are needed. Indeed, half or more of the institution's disciplinary cells are double-celled at this time, and many prisoners are assigned to "disciplinary segregation" in double-celled facilities in general population or to beds in open dormitory areas in dayrooms. Thus, the degree of crowding presently being experienced in the ISC and the Annex both increases the likelihood of serious disciplinary offenses and makes effective punishment of offenders impracticable. Without doubt, this state of affairs contrib-

---

3. On at least one occasion, a nurse worked eleven consecutive eight-hour shifts.

4. Although the expert has emphasized the extent to which the absence of classification and the mixing of various classes of prisoners exacerbate the negative effects of crowding, it is equally true that classification cannot be effectively implemented until the population levels of the ISC and the Annex have been reduced dramatically. Classification is meaningless unless it leads to appropriate bed and program assignments identified by the classification process. As long as the population levels of the intake facilities remain at their current levels, let alone at higher ones, module and bed assignments will continue to be bed-driven, and there will not be room for program staff or for the conduct of inmate programming. Only prompt and substantial depopulation will break this dangerous cycle.

utes directly and substantially to an environment in which neither inmates nor staff are safe.

Crowding also is directly related to the need for officers to use physical force to control prisoners. Many uses of force result from tensions created by crowding, *e.g.*, limited numbers of telephones and hygiene fixtures and the insecurity of personal property in makeshift dormitories. Moreover, there is a constant danger that otherwise controllable incidents will become uncontrollable when they occur in open areas such as dayrooms, where many inmates are congregated at the time trouble erupts. The reality of this danger is underscored by the fact that 42% of the uses of force reported at the ISC between January 1988 and February 1990 occurred in dayrooms.

Idleness in the ISC and the Annex is pervasive. There simply are not enough meaningful jobs or programs to keep prisoners busy. During 1989, between 96 and 114 inmates were employed in any capacity, and most of these jobs were hallway/module porter positions involving a substantial degree of underemployment. The dearth of work opportunities is exacerbated by the near total absence of other forms of programming—educational, general or law library, counseling, or other program activities. Some 52 prisoners are involved in part-time academic educational programs at the ISC, and no vocational education of any kind is offered at the ISC or the Annex. No educational activities other than the distribution of art supplies twice each week are available to prisoners in the Annex.

Apart from book carts with a limited selection of reading materials that are located in modules at the ISC and the Annex, there are no general library facilities for prisoners, and the former law library at the ISC now is used to house prisoners. Prisoners cannot obtain legal materials unless they know what precise books they need, and they must request these books from the part-time law librarian responsible for

the entire ACI. Crowding has created unmanageable caseloads for counselors, virtually precluding any provision of meaningful counseling services to prisoners. Although prisoners may engage in out-of-cell "recreation" some eight to nine hours per day, crowding in dayrooms at the ISC and the Annex and in outdoor recreation areas at the ISC renders this opportunity illusory, and many inmates forego opportunities to recreate because of the crowded conditions they encounter. Visiting also is affected by crowding, as visiting facilities are inadequate to accommodate the number of prisoners held in the two facilities. Beyond the programs that have been described, limited religious programming and movies that are shown in modules two or three times a week constitute the remainder of a prisoner's programmatic activity at the ISC or the Annex.

The extremely limited work and programmatic activities at these facilities, all directly linked to crowding, increase tension among inmates and lead directly to misconduct and use of force. Idleness contributes substantially to an institutional atmosphere that is both dangerous and degenerative.[5]

Finally, the number of prisoners assigned to the ISC and the Annex makes it impossible to maintain reasonably sanitary conditions or to provide routine maintenance necessary to protect the health and safety of prisoners and staff. Crowding has rendered the preventive maintenance program a token operation, as day-to-day reactive maintenance needs, particularly those related to overtaxed hygiene fixtures, mount and are met by an inadequate number of staff. In-house inspections repeatedly note the same environmental deficiencies and the absence of corrective action. The same inspections indicate that ventilation is altogether inadequate, particularly at the Annex, and that potentially hazardous foods are held repeatedly at unsafe temperatures.

The combination of conditions described thus far would be unacceptable even if

---

5. As has been pointed out, the use of virtually all available space for the housing of prisoners precludes increases in program staff or in inmate programming.

prisoners were exposed to them only for short periods of time. This, however, is not the case. A study that was conducted by the expert with respect to sentenced prisoners establishes that the *average* time these prisoners spend in the ISC and the Annex is 155 days (22 weeks) and that the longest time any sentenced prisoner in the sample spent in these facilities was 774 days. As of February 26, 1990, 75% of the 303 sentenced prisoners in these facilities had been assigned to the ISC or the Annex for more than 45 days. Thus, confinement in the intake facilities is not a short-term status, and the deleterious effects of extreme crowding demonstrated in the expert's report affect large numbers of prisoners for substantial periods of time.

In summary, the ISC and the Annex are critically overcrowded at this time and threaten to become even more crowded between today and November 1990. In at least some instances, the degree of population density, in and of itself, is altogether unacceptable, quite apart from the other effects of crowding. The provision of a mere 2.8 or 13 square feet of living space for prisoners is *per se* indefensible in the expert's opinion, as is the provision of fewer than 13 square feet of dayroom space for indoor recreational activities. Although not all prisoners suffer such extreme deprivations of space in which to live and sleep, all prisoners in both facilities are exposed to the dangers of understaffing and inadequate surveillance, violence, ineffective discipline, use of force, idleness, absence or inadequacy of critical services, and unsanitary and unhealthy environmental conditions that are direct results of crowding. Moreover, and the expert cannot stress the point too strongly, the excessively dangerous conditions in the ISC and Annex are magnified immensely by the absence of classification and the inability to implement classification decisions that are made because of crowding. By all standards, the ISC and the Annex are correctional disasters, and, as the Court has noted in more than one of its opinions in this case, these facilities are even more violent disasters waiting to happen.

In his comprehensive report, the expert responded to a number of questions set forth in the Court's order of February 5, 1990. In this summary, the expert will concentrate his discussion on the answer to the last of these questions, which subsumes the others. That question is,

> In the absence of satisfactory temporary relief, what remedies does the expert recommend the Court adopt?

The expert strongly believes that the maximum number of prisoners that can be housed in accordance with minimum standards of safety and decency is 250 at the ISC and 90 at the Annex, and he made several recommendations in his comprehensive report to accomplish these objectives as promptly as possible in keeping with public safety. He has recommended that at least $1,000,000 be made available immediately, either through the levying of a fine or, if such an alternative is feasible, by directing defendants to make the full faith and credit of the State of Rhode Island available in at least this amount to finance an Overcrowding Relief Fund designed to divert from ACI facilities pretrial prisoners with bail set at $10,000 cash or less (or its equivalent). He also has recommended consecutive awards of accelerated good time to all sentenced prisoners in the ACI, excepting perhaps prisoners convicted of certainly carefully and narrowly selected, extremely serious offenses, in order to reduce the sentenced population in intake facilities. These two recommendations, if implemented, promise rapid reduction of both the pretrial and sentenced population in the ISC and the Annex.[6]

---

**6.** The expert has refrained from recommending immediate releases from the ISC and the Annex or a moratorium on intake into those facilities not because the problems existing in those institutions fail to justify such drastic action. Immediate releases have not been recommended, because the expert hopes that his recommendations regarding the Overcrowding Relief Fund and expedited awards of good time will adequately address the problem of crowding and its ramifications. Moreover, a moratorium on intake in all likelihood simply would shift admissions and the resultant problem of crowding to other ACI facilities.

In order to ensure that these actions will achieve the necessary reduction in population, the expert also has recommended a timetable for reduction of the population of the ISC and the Annex to 250 and 90, respectively, and the imposition of substantial fines in the event defendants fail to achieve these reductions. Moreover, in order to permit even these numbers of prisoners to be held in these facilities, the expert has recommended that no later than 60 days following the entry of the Court's order, by which time the population of the ISC should have fallen to 350 and the population of the Annex should have fallen to 134, classification restrictions be imposed on assignments to double occupancy cells and dormitories.

Finally, the expert has recommended that the responsibility remain with defendants to achieve the recommended maximum capacities in the event that the Overcrowding Relief Fund and the expedited awards of good time fail to accomplish these objectives. The success of both of these mechanisms will depend to a large extent on the actions of state officials who are not parties to this lawsuit, judges who set bail and members of the parole board.

All of these recommendations are directly related to the problem of extreme crowding in the ISC and the Annex and to amelioration of the ramifications of crowding that are described in detail in the expert's comprehensive report. The expanded implementation of the Overcrowding Relief Fund will reduce the intake of prisoners into the ISC and the Annex, and expedited awards of good time will increase the flow of prisoners from all ACI facilities, thus reducing pressure to hold sentenced prisoners in intake facilities beyond the time that is required to classify them. Vigorous enforcement of maximum capacities according to the timetables recommended by the expert will be required to ensure the effectiveness of these remedial actions, and the recommendations of the expert relating to classification must be implemented to permit more than 168 prisoners to housed in the ISC and to permit any use of the Annex. The expert's final recommendation simply ensures that the defendants ultimately will shoulder the responsibility of maintaining constitutional conditions in the ISC and the Annex.

In conclusion, the expert believes that crowding in the ISC and the Annex has reached crisis proportions that demand immediate action by the Court. The recommendations set forth in detail in the comprehensive report and reiterated in abbreviated fashion in this summary constitute the expert's best judgment regarding the nature of the immediate action that is urgently required.

Respectfully submitted,
/s/ Vincent M. Nathan
Vincent M. Nathan